UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 18-cv-61821-CIV-DIMITROULEAS
Magistrate Judge Snow

LARRY BLOCH,

    Plaintiff,

v.

BEARD MARINE AIR CONDITIONING &
REFRIGERATION, INC., a Florida for profit
corporation,

    Defendant.
_____/

**DEFENDANT'S RESPONSE TO JOINT DAUBERT MOTION REGARDING THE TESTIMONY AND EVIDENCE BY INSPECTOR TYRON "PACKET" CASEY AND INCORPORATED MEMORANDUM OF LAW**

| | |
|---|---|
| Jack R. Reiter, Esq. | Michael J. Reilly, Esq. |
| jack.reiter@gray-robinson.com | MREILLY5@travelers.com |
| Robert C. Weill, Esq. | Law Offices of James W. Kehoe, III |
| robert.weill@gray-robinson.com | 3230 West Commercial Blvd., Suite 2300 |
| GrayRobinson, P.A. | Mailing Address: |
| 333 SE Second Avenue, Suite 3200 | P.O. Box 2903 |
| Miami, Florida 33131 | Hartford, Connecticut 06104-2903 |
| Telephone: (305) 416-6880 | Telephone: (954) 677-3707 |
| Facsimile: (305) 416-6887 | Facsimile:  (866) 292-4641 |

*Counsel for Defendant Beard Marine Air Conditioning & Refrigeration, Inc.*

Defendant Beard Marine Air Conditioning & Refrigeration, Inc. ("Beard Marine"), files its response to the Joint *Daubert* Motion Regarding the Testimony and Evidence of Tyron "Packet" Casey as an expert witness.

1

I. **Preliminary Statement**

This case arises from the April 24, 2018 fire aboard the M/Y *Tivoli* while it was under refit at Marina Mile Yachting Center in Fort Lauderdale, Florida. The Plaintiff's Complaint merely alleged that the fire originated in a port side crew compartment air conditioning cabinet but never made any allegation as to what caused the fire. (See Complaint, ECF No. 1, at par. 24.) The fire was investigated by the City of Fort Lauderdale Fire Department, which made a determination that the fire originated in the area of a collision bulkhead separating the anchor locker at the bow of the ship from the crew quarters where the Defendant's air conditioning cabinet. The City of Fort Lauderdale Fire Department fire investigator was Tyron "Packet" Casey. Mr. Casey also offered a second opinion in his report, which was that the probable cause of the fire was hot work being performed on the collision bulkhead. For that reason, Defendant Beard Marine filed a third-party complaint under Rule 14(c) against MMYC, LLC d/b/a Marina Mile Yachting Center and its contractor, Ophir Yacht Modifications, Inc., which were responsible for the hot work operations aboard M/Y *Tivoli*. (See Third-Party Complaint, ECF No. 24.)

It is true, as pointed out by the Joint Daubert Motion of MMYC, LLC and Ophir Yacht Modifications, Inc., that Inspector Casey acknowledged at his May 23, 2019 "he could not say with certainty that hot work was the cause of the fire." Joint Mot. at page 6. However, fire investigation opinions consist of two separate components, an opinion of where the fire originated and a separate opinion on the cause of the fire. Beard Marine agrees with MMYC, LLC and Ophir Yacht Modifications, Inc. that Inspector Casey did not have a complete cause opinion. In fact, the position of Beard Marine on the issue of fire cause agrees with MMYC, LLC

(and apparently Ophir Yacht Modifications, Inc.)[1] that the cause of the fire aboard M/Y *Tivoli* is undetermined. For that reason, Defendant Beard Marine filed no opposition to the Motion for Summary Judgment filed by MMYC, LLC and Ophir Yacht Modifications, Inc. See ECF no. 45.[2] Even the Plaintiff's cause expert, James A. Coté, published a May 8, 2019 report with his expert disclosure indicating the cause of the fire cannot be determined to a reasonable degree of scientific certainty and subsequently appeared seven weeks later at his deposition without a final opinion on the cause of the fire.[3] In fact, no expert in this case has offered a specific cause of the fire aboard M/Y *Tivoli*, with each party suggesting various hypotheses or possible causes.

However, as set forth below, Inspector Casey's opinion limited to the area of origin for the fire is admissible under *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993).

## II. The Refit Work in the Anchor Locker of M/Y Tivoli

Bill Steely was the project manager for the refit of M/Y *Tivoli*. (See deposition of William Steely ("Steely dep."), Exhibit A, pg. 7, lines 11-21) Part of the refit involved replacing rusted metal flooring inside the chain locker or forward compartment of M/Y *Tivoli*. (Steely dep., Exhibit A, pg. 29, ln. 25 through pg. 30, ln. 9) Ophir Yacht Modifications, Inc. was the contractor that performed the work in the anchor locker. Mr. Bloch did not hire Ophir Yacht Modifications, Marina Mile Yachting Center did. (Steely dep., Exhibit A, pg. 30, lines 22-25 ) According to Mr. Steely, Ophir Yacht Modifications never informed him when hot work was going to be performed. (Steely dep. Exhibit A, pg. 31, ln. 23 through pg. 32, ln. 1) Although he was the project manager in charge of the refit, Mr. Steely testified that he was not aware of the

---

[1] The expert disclosure of Ophir Yacht Modifications, Inc. does not identify a specific cause of the fire. See Exhibit J.
[2] As noted in Plaintiff's Response to Third-Party Defendants Motion for Summary Judgment, following exchange of expert witness disclosures, it was the Plaintiff that would not consent to the dismissal of MMYC, LLC and Ophir Yacht Modifications, Inc. See ECF no. 51 at page 2.
[3] Pending before the Court is Defendant's Motion to Strike James Coté as he failed to serve a report with a complete statement of facts and opinions with his disclosure and then appeared for deposition seven weeks after his report was issued and again testified he could not offer final opinions on the cause of the fire. See ECF no. 47.

last time that Ophir Yacht Modifications performed any hot work aboard M/Y *Tivoli*. (Steely dep., Exhibit A, pg. 32, lines 23-25)

While he never saw Ophir Yacht Modifications setting up to do hot work, Mr. Steely did see fuel gas lines he associated with hot work leading into the anchor locker. (Steely dep., Exhibit A, pg. 84, ln. 4 through pg. 87, ln. 13) Mr. Steely said he was never told that there was going to be hot work on the bulkhead separating the anchor locker from the crew berth area. (Steely dep., Exhibit A, pg. 88, lines 4-18) After the fire, Mr. Steely saw for himself that both a torch and a grinder had been used on the bulkhead that separates the anchor locker from the crew quarters. (Steely dep. Exhibit A, pg. 89, lines 12-16)

Prior to the start of the work in the anchor locker, MMYC, LLC retained a marine chemist to issue the hot work permit or marine chemist certificate. The marine chemist was Blair Duff. Mr. Duff issued his hot work permit on April 13, 2018. He testified the marine chemist certificate was good for 24 hours or it can be maintained if a shipyard competent person is performing re-inspections. (See deposition of Blair Duff ("Duff dep."), Exhibit B, pg. 13, lines 12-25.) David Henderson at Marina Mile Yachting Center would have been doing the re-inspections. (Duff dep., Exhibit B, pg. 14, lines 1-14.) When the marine chemist performed his inspection, he was told that there was not going to be any hot work on the bulkhead. (Duff dep., Exhibit B, pg. 18, ln. 17 through pg. 20, ln. 21.) If Mr. Duff had been advised that Ophir Yacht Modifications would have been doing hot work on the bulkhead, he would have mandated removal of the insulation and the wood on the other side. (Duff dep, Exhibit B, pg. 23, ln. 8 through pg. 24, ln. 19.)

David Hole is the general manager of Marina Mile Yachting Center and also testified in this case. (See deposition of David Hole ("Hole dep."), Exhibit C, pg. 8, lines 6-11) Marina Mile

Yachting Center always retains a marine chemist when hot work is going to be performed in confined spaces. In this case, Blair Duff issued the April 13, 2018 marine chemist certificate but Marina Mile Yachting center was not doing re-inspections because it did not know when hot work was being performed. (Hole dep., Exhibit C, pg. 12, ln. 6 through pg. 14, ln. 24) According to Mr. Hole, the original assumption was that the bulkhead separating the anchor locker from the crew quarters was a vertical bulkhead, and the work order did not include hot work on the bulkhead itself. (Hole dep., Exhibit C, pg. 17, ln. 8 through pg. 18, ln. 21.)

Mr. Hole indicated that there was cutting and grinding in the anchor locker between April 13, 2018 and the fire of April 24, 2018, and he became aware of this after being called to M/Y *Tivoli* on Friday, April 20, 2018 for a reinspection. (Hole dep., Exhibit C, pg. 18, ln. 22 through pg. 25, ln. 9.) Mr. Hole testified that he issued a stop work order to Bill Steely and Clive Reid on any further hot work in the anchor locker as the configuration of the bulkhead was not vertical but ran horizontal toward the stern and that Marina Mile Yachting Center's shipyard competent person would need to reinspect. (Hole dep., Exhibit C, pg. 69, ln. 18 through pg. 73, ln. 19.)

Mr. Hole's account was substantiated by David Henderson, the shipyard competent person at Marina Mile Yachting Center. Mr. Henderson confirmed that the original work order for the anchor locker work had no indication of any hot work that was to be performed on the bulkhead between that space and the crew quarters. (See deposition of David Henderson ("Henderson dep."), Exhibit D, pg. 11, ln. 14 through pg. 13, ln. 8.) Mr. Henderson confirmed that Marina Mile Yachting Center always calls in a marine chemist to issue a certificate for hot work in confined spaces, then the marina does the follow-up re-inspections. (Henderson dep., Exhibit D, pg. 16, ln. 12 through pg. 17, ln. 1.) Mr. Henderson, as Mr. Hole had done, stated that

Marina Mile Yachting Center was not performing re-inspections under the April 13, 2018 marine chemist certificate. (Henderson dep., Exhibit D, pg. 17, ln. 24 through pg. 18, ln. 3.)[4]

After the fire, Mr. Henderson and Mr. Hole discussed the fact that Clive Reid should not have been doing any work in anchor locker without daily re-inspections by a shipyard competent person. (Henderson dep, Exhibit D, pg. 22, ln. 20 through pg. 23, ln. 14.) Mr. Duff testified that on the day of the fire, he met David Hole from Marina Mile Yachting Center at the scene of the fire and Mr. Hole told him there should not have been any hot work in the anchor locker as the marina was not doing re-inspections under his marine chemist certificate. (Duff dep., Exhibit B, pg. 12, ln. 13 through pg. 13, ln. 8.) Mr. Duff, in his deposition, confirmed that Clive Reid was present at the joint fire inspection after the fire on June 5, 2018 and admitted he and another worker were in the anchor locker using grinders on the day of the fire. (Duff dep. Exhibit B, pg. 10, ln. 3 through pg. 11, ln. 9.) Mr. Duff, a marine chemist specializing in confined space inspections involving hot work, testified that grinding is considered hot work under applicable standards. (Duff dep. Exhibit B, pg. 16, lines 13-24.)

For his part, Clive Reid testified that on the day of the fire, he and his worker, Osmany Gonzalez, started at about 8:30 a.m. (See deposition of Clive Reid ("Reid dep."), Exhibit E, pg. 90, lines 12-15) Mr. Reid testified that the oxyacetylene cutting torch was on the deck of M/Y *Tivoli,* where he kept it every day. (Reid dep., Exhibit E, pg. 90, lines 16-21)[5] Mr. Reid said that about 10:00 a.m. that morning he and Osmany Gonzalez started experiencing electrical shocks in the anchor locker. (Reid dep. Exhibit E, pg. 91, ln. 18 through pg. 92, ln. 3.)

---

[4] Mr. Steely did not know if Marina Mile Yachting Center was doing re-inspections under the April 13, 2018 marine chemist certificate, nor does he recall any discussion with David Hole from Marina Mile Yachting Center and Clive Reid discussing a change to include hot work on the bulkhead. (Steely dep., Exhibit A, pg. 87, ln. 14 through pg. 88, ln. 3)

[5] Mr. Steely testified he did not recall the cutting torch being stored on the deck of m/Y Tivoli at any time. See Steely dep., Exhibit A, pg. 86, lines 11-15.)

6

Later Mr. Reid said that from 8:35 a.m. to noon on the date of the fire, he was not even in the anchor locker when the fire occurred as he was working on some other project he could not remember anything about. (Reid dep., Exhibit E, pg. 95, ln. 1 through pg. 97, ln. 22.)

### III. The Investigation by Investigator Packet Casey

Inspector Casey is a fire inspector on the fire investigations team. (See deposition of Tyron Casey ("Casey dep."), Exhibit F, pg. 6, ln. 25 through pg. 26, ln. 2) Inspector Casey has been with the City of Fort Lauderdale Fire Department for three years and employed as a fire investigator for a year. (Casey dep. Exhibit F, pg. 7, lines 3-11) The role of the fire inspector is to "determine origin, cause and development of the fire." (Casey dep., Exhibit F, pg. 7, lines 12-16) Inspector Casey has taken investigation courses in the origin and cause of a fire in order to secure his position. (Casey dep., Exhibit F, pg. 7, ln. 17 through pg. 9, ln. 6) Inspector Casey investigated 20-30 fires before the *Tivoli* fire in April 2018. (Casey dep., Exhibit F, pg. 10, lines 1-10).

Inspector Casey's involvement in the *Tivoli* fire was to determine the origin and cause. (pg. 13, lines 22-25)

> Q. Can you tell us what is your involvement in the Tivoli fire?
> A. I was there to determine the origin and cause.
> Q. And were you able to do that?
> A. **I was able to find the origin. The cause was—it wasn't a determination. It was a possible determination. It was – I didn't pinpoint the exact finding, but with what I saw, it was my theory of how the fire started.**
> Q. Which was?
> A. Which was due to hot work operations.
> Q. Okay. And what was the origin or the area of origin of the fire?
> A. It was in the anchor locker.
> Q. So the fire starts in the anchor locker?
> A. No. The fire starts on the other side of the anchor locker. So it's a steel structure boat, right? So the guys are – what I saw, the guys were removing a floor panel, a metal steel floor panel, which was part of the anchor locker. And behind the anchor locker there's the interior of the boat, the crew quarters. And all those

7

>  bulkheads are built of wood that goes up alongside inside the structure of the steel hull.
> And so the origin – the area of origin was, from my point of view, started in the anchor locker. But the heat transfer transferred to the bulkhead behind the anchor locker.
>
> (Casey dep., Exhibit F, pg. 13, ln. 22 through pg. 14, ln. 25) (Emphasis added)

As part of his origin determination, Inspector Casey interviewed the available witnesses.

> A.   But the one guy I got the most information from was the witness on the other boat, Jamal Rashdan, this guy. He told me what he saw. Other guys, they were in the back of the boat. They didn't see anything.
> Q.   Okay. So Jamal Rashdan, he was a person on a boat nearby.
> A.   Yeah.
> Q.   And was he still on scene when you were there?
> A.   Yeah.
> Q.   You specifically recall talking to him?
> A.   I do.
> Q.   Do you recall what he told you that was important to your investigation?
> A.   **Yeah. He said to me there were guys that were working on the front desk – on the top deck, I mean, and smoke started coming out, started seeing smoke. And the guys automatically jumped out, were removing all the welding hot work lines and machinery and throwing them off the boat.**
>
> (Casey dep., Exhibit F, pg. 25, ln. 25 through pg. 26, ln. 20) (Emphasis added)

Inspector Casey also interviewed the owner's engineer who was running the refit of Tivoli, who told him that no hot work was taking place on M/Y *Tivoli* at the time of the fire.

> A.   There was someone else, who is part of the operations of the boat that was under refit, who basically, when we after the fire had been put out he – he said he was the scientific engineer or something to do with the boat, who wanted to refuse us from entering the boat.
> And for our investigation, we, the police and everybody, we removed him away so we could do our investigation.
> Q.   He was somebody from the boat?
> A.   He was somebody with the boat, representing the boat.
> Q.   That wasn't Bill Steele[sic], was it?
> A.   **I didn't get hm name, but he was trying to refuse us from entering the boat. And he also said to me there was no hot work being done on the boat that day, but from the witness it was very clear that there was hot work. As soon as the smoke started, the workers started jumping out the front of the boat and pulling all the hot work tools off the boat. I mean, in that area, it was very apparent that there was work being done in the anchor locker.**
>
> (Casey dep., Exhibit F, pg.29, lines 1-24) (Emphasis added)

8

Inspector Casey recognized the importance of interviewing witnesses when making a determination on the area of origin for the fire:

> Q. You've had training in the investigation of the origin and cause of fires, right?
> A. Correct.
> Q. And when you investigate a fire on the issue of origin, there are a number of things you would look at, correct?
> A. Yeah.
> Q. And in [sic] here you looked at a number of different data points; true?
> A. Correct.
> Q. You were told by a representative of the vessel, that there was no hot work going on in the vessel that day?
> A. Correct.
> (Casey dep., Exhibit F, pg.47, lines 1-16)
>
> Q. Is it true that when you investigate a fire for origin, it would be important to talk to witnesses who saw the fire?
> A. Yes.
> Q. And you did that in this case, right?
> A. Yeah.
> Q. The available witnesses, right?
> A. Yes.
> (Casey dep., Exhibit F, pg. 48, lines 8-15)
>
> Q. Did you, as part of your investigation, talk to the first-in firefighters?
> A. Yes.
> Q. And what did they tell you?
> A. **They made entry. Made their way down – it was obviously thick black smoke coming out and made their way down into the forward area of the boat, where they found the fire involved in the ceiling.**
> (Casey dep., Exhibit F, pg. 49, lines 9-17) (Emphasis added)
>
> Q. And when you're talking about the ceiling area, are you talking about forward in the crew compartment toward the bulkhead?
> A. **Correct.**
> Q. The area above the bulkhead where you have the fire – the extension of the fire after it?
> A. **Yeah.**
> (Casey dep., Exhibit F, pg. 50, lines 11-16) (Emphasis added)

Inspector Casey also surveyed the electrical wiring when making his determination of fire origin.

9

> Q. You talked a little before that you looked at the electrical wiring that was up in the ceiling area as part of your investigation?
> A. (Witness nods)
> Q. Is that because when you're looking at the – trying to determine the origin of a fire, it's important to look to see where there might be areas of electrical damage?
> A. Yeah. I mean, you're looking on the –on the wires themselves . . . But, you know, we do inspect the wires to see if there's beading occurred on the wires themselves, which would lead us to a location.
> (Casey dep., Exhibit F, pg. 51, lines 5-19)

Inspector Casey also followed the recognized methodology of fire pattern analysis and an understanding of the growth and development of the fire when arriving at his opinion on fire origin.

> Q. When you investigate a fire on the issue of origin, is it true that one of the things that you'd be looking at are fire patterns?
> A. Yes.
> (Casey dep., Exhibit F, pg. 48, lines 4-7)
>
> Q. So we talked a little bit about the importance of fire patterns and witness statements and electrical damage to the origin opinion.
> And is it also important when you're looking at origin, to have an understanding of the growth and development of the fire?
> A. Yes.
> Q. It's something that you learned during your training classes?
> A. Yeah.
> (Casey dep., Exhibit F, pg. 3-12)

Inspector Casey then prepared a scene diagram for the fire that encapsulated his opinion on fire origin, which did not include the area in the rear of the crew berth where Beard Marine's air handler was located.

> Q. Mr. Casey, did you do a scene diagram?
> A. I think I did Yeah, I did.
> MR. GAMBACH: It's No. 4 in the notebook. Do you want them? Last page before the pictures.
> Q. Is it your common practice to do a scene diagram to show the area of origin for the fire?
> A. Yes.
> Q. Something you learned during your training and certifications?
> A. Yeah.

Q. **You were shown photographs of an air handler cabinet that was rear of the crew quarters?**
A. Yeah.
Q. **That wasn't in your defined area of origin for this fire, was it?**
A. No.
Q. **And did you learn, as part of your training and certification, that your job as a fire investigator is to define the area of origin and then evaluate the ignition sources within the area where the fire started?**
A. Correct.
Q. **So you wouldn't, in this case, evaluate every possible ignition source on Tivoli, you would look at those ignition sources that were within your defined area of origin?**
A. Correct.
Q. That's common fire investigation practice?
A. Correct.

(Casey dep., Exhibit F, pg. 52, ln. 18 through pg. 53, ln. 24) (Emphasis added)

## ARGUMENT

### THE OPINION OF INSPECTOR TYRON "PACKET" CASEY OF THE CITY OF FORT LAUDERDALE FIRE DEPARTMENT ON THE ISSUE OF FIRE ORIGIN (VERSUS FIRE CAUSE) IS ADMISSIBLE AS THE FIRE MARSHAL FOLLOWED THE SCIENTIFIC METHOD FOR ORIGIN DETERMINATION SET FORTH IN NFPA 921, GUIDETO FIRE AND EXPLOSION INVESTIGATIONS

MMYC, LLC and Ophir Yacht Modifications, Inc. argue that Inspector Casey's opinion testimony and evidence should be barred because he did not reach an opinion on the specific cause of the fire. However, Defendant named Inspector Casey as a non-retained expert witness not on the issue of fire cause but rather on the issue of the geographic location or origin of where the fire started. As to Inspector Casey, Beard Marine's expert witness disclosure simply stated:

A. **Witnesses Who May Provide Opinion Testimony Pursuant to Rule 26(a)(2)(C)**

> **Tyron "Packet" Casey**
> **Fire Investigator**
> **Fire Investigation Unit**
> **Fort Lauderdale Fire-Rescue**
> **528 NW 2nd St.**
> **Fort Lauderdale FL 33311**

11

Investigator Casey will testify to the public sector investigation into the origin and cause of the fire aboard M/Y *Tivoli* as reflected in his written report and his deposition testimony of May 23, 2019. A copy of his report is attached as Exhibit E. Investigator Casey is expected to testify consistent with his deposition testimony that when he arrived to investigate the fire aboard M/Y *Tivoli* the owner's engineer refused entry and denied that any hot work had been taking place aboard the vessel that day. The owner's representative told Inspector Casey that hot work was to occur the next day. The owner's engineer was removed so that the investigation could commence. Investigator Casey observed a torch on the loading dock that was still connected to gas cylinders. Inside the anchor locker, Investigator Casey found a grinder and observed what he knew to be both grinding and torch cuts into a metal plate at the bulkhead. Investigator Casey conducted a witness interview and learned that when the fire occurred the welders tossed the cutting torch and fuel gas lines off M/Y *Tivoli* to the dock where he first observed it, and began closing the gas cylinders.

**Based on his experience, education and training, including knowledge of boat construction and bulkheads, Investigator Casey used fire patterns, a survey for electrical damage, an eyewitness statement and fire dynamics to place the <u>origin</u> of the fire at the bulkhead supporting a hypothesis that the cause was the result of what he opined was heat transmission from the work in the anchor locker.**
(See Beard Marine Expert Witness Disclosure, at Exhibit G)

Beard Marine's expert witness disclosure as to Inspector Casey is therefore limited to the issue of fire origin and that a hypothesis of a hot work fire cannot be excluded. Nowhere has Beard Marine proffered Inspector Casey to offer opinion testimony on the probable cause of the fire. In fact, it is the position of Beard Marine that the specific cause of the fire is undetermined as in addition to the hot work there is also a possible fire cause in M/Y *Tivoli*'s electrical wiring on the port side. See May 20, 2019 report of Mark Beavers, at Exhibit H. In fact, MMYC, LLC has also provided expert disclosures opining that the cause of the fire is undetermined, pointing to the same electrical wiring as a potential cause. See report of Kerns Fire Consultants, Inc., at Exhibit I. For its part, Ophir Yacht Modifications, Inc. has served a "Preliminary Investigative Report" that merely argues that the burn through at the bulkhead caused by the hot work is not connected to what it contends is an entirely separate fire that occurred elsewhere in the crew berth area of M/Y *Tivoli*. See Preliminary Investigative Report of ESi, at Exhibit J.

In almost every fire case, expert opinion from a fire origin and cause expert is necessary to establish the area of origin and source of ignition for the fire. In many cases, a technical expert, other than the fire investigator, is retained to offer opinion testimony on the specific cause.

This process has been employed by all of the parties to this case, with each serving a disclosure by both a fire investigator on the issue of origin as well as a technical expert to address fire causation arguments. Plaintiff's fire investigator is Dennis Kerr. Defendant's fire investigator is Mark Beavers, MMYC's fire investigator is Bruce Kerns of Kerns Fire Consultants, Inc. Each of the disclosures by Mr. Kerr, Mr. Beavers and Mr. Kerns references the methodology of NFPA 921, Guide to Fire and Explosion Investigations.[6]

For example, MMYC, LLC's fire investigator, Bruce Kerns, in his report in this case states:

> KFCI's [Kern Fire Consultants, Inc.] investigation was conducted using the scientific method and the practices detailed in NFPA 921 Guide for Fire and Explosion Investigations.
> (See June 20, 2019 report of Kerns Fire Consultants, Exhibit I, at page 1.)

For his part, Plaintiff's fire investigator Dennis Kerr stated in his report that he acknowledged NFPA 921 as the standard for fire investigation:

> Kerr Fire Investigations, Inc. relies on NFPA 921 Guide for Fire and Explosion Investigations, which is a guideline used by fire investigators to conduct fire and explosion investigation. This document is recognized as the standard of care in the fire investigation community. The Scientific Method is used for origin and cause determination.
> (See May 7, 2019 report of Kerr Fire Investigations, Exhibit K, at page 2.)

Similarly, Beard Marine's fire investigator referenced NFPA 921 as the methodology that should be used.

---

[6] There is also a reference to NFPA 921 in the expert witness disclosure of Ophir Yacht Modifications, Inc., which was signed by both a fire investigator and an engineer. See Exhibit J.

13

> This investigation was conducted in accordance with the methodologies and processes detailed in the National Fire Protection Association Document 921, Guide for Fire and Explosion Investigations, 2017 edition.
> (See May 20, 2019 report of Mark Beavers, Exhibit H, at page 2.)

Under NFPA 921, the origin of a fire and the cause of the fire are two separate determinations, each governed by the scientific method. The following definition in the document are relevant to the issue of origin and the separate issue of cause.

> **3.3.133 Origin**. The general location where a fire or explosion began. (*See 3.3.142 Point of Origin, or 3.3.12, Area of Origin*)
>
> **3.3.12 Area of Origin**. A structure, part of a structure, or general geographic location within a fire scene, in which the "*point of origin*" of a fire or explosion is reasonably believed to be located.
>
> **3.3.142 Point of Origin.** The exact physical location within the area of origin where a heat source and a fuel first interact, resulting in a fire or explosion.
>
> **3.3.69 Fire Cause.** The circumstances, conditions, or agencies that bring together a fuel, ignition source, and oxidizer (such as air or oxygen) resulting in a fire or a combustion explosion.
>
> **3.3.160 Scientific Method.** The systematic pursuit of knowledge involving the recognition and definition of a problem; the collection of data through observation and experimentation; analysis of the data; the formulation, evaluation and testing of hypotheses; and, where possible, the selection of a final hypothesis.

Chapter 4 of NFPA 921 covers the basic methodology of a fire investigation, which has separate components for the origin determination from that of a cause determination.

> **4.1 Basic Methodology** . . . With few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together.

NFPA 921 has separate chapters and separate processes for the determination of the origin of a fire that are distinct from the cause of a fire. Chapter 18 of NFPA 921 covers fire origin determination.

Chapter 18 Origin Determination

18.1 Introduction. This chapter recommends a methodology to follow in determining the origin of a fire. The *area of origin* is defined as a structure, part of a structure, or general geographic location within a fire scene, in which the "point or origin" of a fire or explosion is reasonably believed to be located. The *point of origin* is defined as the exact physical location within the area of origin where a heat source and the fuel interact, resulting in a fire or explosion. The origin of a fire is one of the most important hypotheses that an investigator develops and tests during the investigation. Generally, if the origin cannot be determined, the cause cannot be determined, and generally if the correct origin is not identified, the subsequent cause determination will also be incorrect. **The purpose of determining the origin of the fire it to identify in three dimensions the locations at which the fire began.**

18.1.1 This chapter deals primarily with the determination of origin involving structures; however, the methodology generally applies to all origin determinations.

Under the origin determination chapter, there are four investigative techniques used by an

investigator to arrive at the geographic origin.

18.1.2 Determination of the origin of the fire involves the coordination and information derived from one or more of the following:

(1) *Witness information and Electronic Data*. The analysis of observations reported by persons who witnessed the fire or were aware of conditions present at the time of the fire as well as the analysis of electronic data such as security camera footage, alarm system activation, or other such data recorded in and around the time of the fire event.
(2) *Fire Patterns*. The analysis of effects and patterns eft by the fire. *(see Chapter 6)*
(3) *Arc Mapping*. The analysis of the locations where electrical arcing has caused damage and the documentation of the involved electrical circuits (see Section 9.10)
(4) *Fire Dynamics*. The analysis of the fire dynamics (i.e., the physics and chemistry o the fire initiation and growth *(see Chapter 5)* and the interaction between the fire and the building's systems *(see Chapter 7)*

The methodology described in the origin chapter is systematic process governed by the

scientific method.

**18.2 Overall Methodology**. The overall methodology for determining the origin of the fire is the scientific method as described in Chapter 4. . .

Chapter 19 of NFPA 921 covers the separate determination of fire causes (versus fire origin), which is also governed by the scientific method.

Chapter 19 Fire Cause Determination

**19.1 Introduction.** This Chapter recommends a methodology to follow in determining the cause of a fire. Fire cause determination is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted n the fire. Fire cause determination generally follows origin determination. (see Origin determination chapter). Generally, a fire cause determination can be considered reliable only if the origin has been correctly identified.

**19.2 Overall Methodology**. The overall methodology for determining the cause of the fire is the scientific method as described in the Basic Methodology chapter. . .

MMYC, LLC and Ophir Yacht Modifications, Inc. conflate the origin opinion of where the fire started with the totally separate issue of fire causation. In a 75-page deposition, Inspector Casey went through his investigation, his photographs and the methodology he used to arrive at his opinion on the origin (versus the cause) of the fire. He explained that he followed a process that involved a scene examination with witness interviews, fire pattern analysis, arc mapping of electrical damage and an evaluation of fire dynamics to arrive at an opinion of where he believed the fire started. Inspector Casey did not offer an opinion on the cause of the fire, just that he could not exclude the possibility that the fire was caused by hot work given the scene examination showed the presence of torch and grinding cuts on a combustible bulkhead, the presence of hot work tools and a witness that saw workers tossing a cutting torch off *Tivoli* at the moment the fire occurred, as well as other evidence.

The Joint *Daubert* Motion of MMYC, LLC and Ophir Yacht Modifications, Inc. does not challenge the qualifications of Inspector Casey to conduct fire investigations or that his methodology for origin determination was not reliable or did not follow the guidance of NFPA 921, which all of the fire investigators in this case have referenced. Since Inspector Casey is not

16

offering an opinion on the specific cause of the fire, but rather an opinion on fire origin, there is no basis for excluding his opinion as to where the fire started.

Defendant has not offered Inspector Casey on the issue of fire cause so a challenge to strike his entire testimony and the evidence he gathered limited to the issue of fire origin is not proper under *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993). *See also United Fire and Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341-1342 (11th Cir. 2013) (error to strike expert's origin opinion just because the opinion on ignition sequence was inadmissible); *Weisgram v. Marley Company*, 169 F.3d 514, 518-519 (8th Cir. 1999) (city fire investigator permitted to testify on the origin of where the fire started but not on the specific cause of the heater malfunction)

Here, Inspector Casey followed the recognized methodology of a fire investigation, which involved a scene investigation. He was told by the owner's representative that no hot work was being performed on M/Y *Tivoli* even though grinders and a cutting torch connected to fuel gas lines were present. Inspector Casey interviewed an eyewitness who saw the workers tossing the welding torch off *Tivoli* when the fire occurred and interviews with first-in firefighters saw a fire burning in the ceiling above the bulkhead, where Inspector Casey observed torch cuts and grinding on the bulkhead. Inspector Casey discussed at length in his deposition his fire pattern analysis that led him to conclude the origin of the fire was at the bulkhead.[7]

---

[7] While it is beyond the subject of a *Daubert* motion as to the fire marshal's opinion, Defendant Beard Marine is the only party to this case that scanned *Tivoli* with a 3D Faro camera showing fire patterns created by the hot work are more extensive than Plaintiff, MMYC, LLC an Ophir Yacht Modifications, Inc. have acknowledged in this case. This 3D scan was the subject of extensive inquiry at the July 20, 2019 deposition of Beard Marine's expert Peter Layson. However, because a specific electrical failure was found on the boat wiring for *Tivoli* in the crew berth area, Beard Marine has not been able to state the probable cause of the fire, which is one of these two possibilities.

## **CONCLUSION**

For the foregoing reasons, Inspector Casey should be permitted to testify to his investigation and his opinion on the origin of the fire aboard M/Y *Tivoli* and why he was unable to rule out a hypothesis of a fire caused by hot work. Beard Marine does not intend to elicit an opinion from Inspector Casey on the cause of the fire so the Joint Motion to strike Inspector Casey's complete testimony and evidence because he did not offer an opinion on fire cause should be denied.

Respectfully Submitted,

*/s/ Michael J. Reilly*
--------------------------------
Michael J. Reilly, Esq.
Florida Bar No.: 56884
MReilly5@travelers.com
Law Offices of James W. Kehoe, III
3230 West Commercial Blvd., Suite 2300
Mailing Address:
P.O. Box 2903
Hartford, Connecticut 06104-2903
Telephone: (954) 677-3707
Facsimile:  (866) 292-4641

*Counsel for Defendant, Beard Marine Air Conditioning & Refrigeration, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of August 2019 a true and correct copy of the foregoing Response was filed and served electronically upon:

Christopher R. Fertig, Esq.
Darlene M. Lidondici, Esq.
Kristen Susik, Esq.
Fertig & Gramling, LP
200 Southeast 13th Street
Fort Lauderdale, Florida 33316
Telephone: (954) 763-5020
Facsimile: (954) 763-5412
chris.fertig@fertig.com
dml@fertig.com
kristen.susik@fertig.com

*Counsel for Plaintiff, Larry Bloch*

Edward S. Polk, Esq.
Daniel Klein, Esq.
Haley N. Kornfield, Esq.
Cole, Scott & Kissane, P.A.
9150 South Dadeland Boulevard, Suite 1400,
Miami, Florida 33256
Telephone: (305) 350-5338
Facsimile: (305) 373-2294
Edward.polk@csklegal.com;
haley.kornfield@csklegal.com;
danise.townsend@csklegal.com.

*Counsel for Third Party Defendant,
OPHIR Yacht Modifications, Inc. and Clive Reid*

Alexander Alvarez, Esq.
Law Office of Alexander Alvarez
8900 SW 107th Avenue, Suite 301
Miami, Florida 33176
Telephone: (305) 598-2000
Facsimile: (786) 228-4890
alex@aalvarezlawfir.com

*Counsel for Third Party Defendant,
MMYC, LLC, d/b/a Marina Mile Yachting Center*

Jerry D. Hamilton, Esq.,
David N. Gambach, Esq.
Evan S. Gutwein, Esq.
Hamilton, Miller & Birthisel, LLP
150 SE 2nd Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 379-3686
Facsimile: (305) 379-3690
Dgambach@HamiltonMillerLaw.com;
egutwein@hamiltonmilaw.com;
EPerez@HamiltonMillerLaw.com;

*Counsel for Third Party Defendant,
MMYC, LLC, d/b/a Marina Mile Yachting Center*